LHE
F. #2020R00925

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF:

ONE RED IPHONE BEARING THE LOGO
"PRODUCT (RED)" ON BACK, AS WELL
AS A STICKER SAYING "ETHIKA;" ONE
RED IPHONE BEARING THE LOGO
"PRODUCT (RED)" ON BACK; ONE BLUE
SAMSUNG PHONE, IMEI #
352863815289256, SERIAL NUMBER
R58R53X3ACY; AND ONE PINK IPHONE
WITH PINK GLITTER PAINT ON THE
BACK, A STICKER SAYING "ETHIKA;"

CURRENTLY LOCATED AT USPIS, 185
W. JOHN STREET, HICKSVILLE, NY
11801
.

**TO BE FILED UNDER SEAL**

**APPLICATION FOR A
SEARCH WARRANT FOR AN
ELECTRONIC DEVICE**

Case No. 21-MJ-966

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Joseph Marcus, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—an

electronic device—which is currently in law enforcement possession, and the extraction from

that property of electronically stored information described in Attachment B.

2.      I am a Postal Inspector with the United States Postal Service ("USPIS") and am currently assigned to a squad that investigates securities fraud, wire fraud and other financial crimes.  During my tenure with the USPIS, I have participated in numerous financial fraud investigations and have participated in all aspects of those investigations, including conducting surveillance, executing search warrants for electronic data, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations and analyzing telephone toll information.  During the course of those investigations, I have served as the lead or co-lead investigator in the investigation and prosecution of persons involved in securities fraud and money laundering, among other crimes.  I have participated in the instant investigation together with a Special Agent from the Internal Revenue Service (the "IRS").

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

4.      The property to be searched are the below electronic devices:

a.   One red iPhone bearing the logo "Product (RED)" on back, as well as a sticker saying "ETHIKA" ("Phone 1");

b.   One red iPhone bearing the logo "Product (RED)" on back ("Phone 2");

c.   One blue Samsung phone, IMEI # 352863815289256, serial number R58R53X3ACY ("Phone 3");

d.   One pink iPhone with pink glitter paint on the back, a sticker saying "ETHIKA" ("Phone 4").

Phones 1-3 were all obtained by the USPIS from a detective with the Evansville, Indiana Police Department, who recovered the devices in connection with a July 21, 2021 arrest of CHASE

HITE.  Phone 4 was recovered by the USPIS from HITE in connection with his August 18, 2021 federal arrest.  The Devices are currently located at USPIS facility in the Eastern District of New York.

5.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## **PROBABLE CAUSE**

Investigation Background

6.      In and around June 2020, a Special Agent with the IRS, working in an undercover capacity (the "UC"), posted a listing on a website called Localcryptos.com ("Localcryptos").  Localcryptos allows users to post messages and arrange to buy and sell digital currency, such as Bitcoin ("BTC"), to one another.  On or about June 15, 2020 the UC, using the username "Mr.Coins" posted an advertisement offering to buy Bitcoin via cash by mail, and to pay above market prices.  The ad directed interested parties to direct "Mr. Coins" via Wickr or WhatsApp.[1]  Shortly after the posting, the UC received an inquiry from an individual using the name "Lucifallen21" on Wickr and Whatsapp expressing interest in purchasing cryptocurrency for cash.  The telephone number associated with the WhatsApp message had the area code 812, which is the area code for the area near Evansville, Indiana.  I have obtained evidence

---

[1]      Wickr is an encrypted messaging application which lets users use end-to-end encrypted and content expiring messages, including photos, videos and file attachments. WhatsApp is an instant messaging app that also offers end-to-end encryption.

establishing that the user of username Lucifallen21 is named CHASE HITE, who resides in Evansville, Indiana.

7.      On or about July 20, 2020, the UC and CHASE HITE agreed to transact, with HITE sending $15,040 in cash to the UC via Priority Mail in exchange for approximately 1.59 BTC.  HITE sent the cash to a post office box in Hicksville, New York, the address to which was provided to him by the UC.  The cash came in a box wrapped in clothes.  United States Postal Service ("USPS") records indicate that the package was sent through a postal facility in Evansville, Indiana.

8.      The UC and CHASE HITE agreed to a further transaction on August 3, 2020, pursuant to which HITE sent $19,840 in cash to the UC via Priority Mail in exchange for approximately 1.34 BTC and approximately 45.2 Monero, another cryptocurrency.  HITE again sent the cash to a post office box in Hicksville, and the cash again came in a box wrapped in clothes. The package was again sent through the USPS in Evansville, Indiana.

9.      The UC and CHASE HITE conducted three further transactions following the same format, with HITE sending cash in the amounts set forth below to the UC in exchange for the BTC and Monero quantities set forth below.[2]

| Date | Cash Amount | BTC / Monero |
|------|-------------|--------------|
| August 17, 2020 | $15,100 | .73 / 59.8 |

---

[2]      The exchange rate between BTC and United States Dollars, and Monero and United States Dollars is highly volatile.

| October 19, 2020 | $30,140 | 1.35 BTC / 27.9 Monero |
| November 2, 2020 | $18,900 | .79 BTC / 70.72 Monero |

10.     In or around March of 2021, investigators planned one additional transaction with CHASE HITE, but this time, Postal Inspectors intercepted the packages containing the money and seized them and arranged for the tracking information on the USPS package to reflect that the package had been lost.  One of the intercepted packages, containing $28,060 in cash, also contained a box for a heated shoulder wrap.  On the box was a distinctive label including a logo that I associate with Wal-Mart.  Records received from several Wal-Marts located in the Evansville, Indiana area reflected that such a wrap had been purchased in the days prior to the shipment of the box.  The purchase was made with cash, and security footage showed two individuals, a man and a woman, making the purchase.  The individuals are both wearing face masks, but the man's overall appearance is consistent with that of CHASE HITE.

11.     The UC messaged CHASE HITE that the package had not arrived via Wickr on or about March 16, 2021.  I then monitored incoming phone calls to the customer service line at the Hicksville, New York post office.  On or about March 18, 2021, I saw that a phone call had come in from an area code for an Indiana telephone.  That telephone number that had called the post office was an AT&T telephone number, subscriber records to which reflected it was a pay-per-use phone without an identified subscriber.  However, the billing information for the credit card that paid the bill for the AT&T telephone was a card in the name of CHASE HITE.

12.     After being notified that the package was missing, CHASE HITE, sent several messages to the UC seeking to negotiate a loan. Specifically, on or about April 4, 2021, HITE wrote on Wickr to the UC "I got like another 50k I could send off I'm just super sketched too lol but if I did that & you could really front me like 30 on top of the 50 I could pay you back 40k within legit 7-14 days . . . whenever that 51k does finally get delivered . . . you can also keep 11k of it and send me 40k." In response to this request, the UC wrote back that he could "float 25k. Biggest concerns are as follows . . . how do I know you can really move 75k that quick? Can you really get ahold of 75k of product right now anyway? No offense but my one buddy has been complaining this whole past year about the covid restrictions fucking with his supply big time. 75k wholesale just seems too good to be true since Empire market went down." Empire Market was an online dark web marketplace, often used for selling narcotics, that stopped operating in or around August 2020.

13.     In response CHASE HITE wrote "I only do good business been fucking with the same plugs for the last 5 years I don't fw markets." Based upon my training and experience, I believe HITE's reference to "plugs" is slang for a source of supply of narcotics, and his reference to markets referred back to the UC's reference to Empire Market. Later on, at approximately 4:14 AM, HITE wrote "I legit just bounced back from that sent 51k it gets lost or whatever . . . I've been out of bud which is the second thing I sell . . . as soon as I get the 80k I'm investing it all with my 2 plugs & I still got a bunch of shit to make money on so by the time my product lands I'll already have at least 10-15k of your 40k. . . . I got people legit just waiting for me to get more the other main thing I sell is pills and opioids, coke & wax & carts which I still have all that I just get 50-60 Ps of tree at a time bc it sells the fastest." Based upon my training and experience, I believe that HITE's reference to pills and opioids refers to illegal trade in

6

painkiller sand other prescription medication, that his reference to coke is a reference to cocaine, his reference to wax is a reference to a form of marijuana, his reference to carts is a reference to marijuana vape cartridges and his reference to tree is a reference to marijuana.  I also believe, based upon my training and experience, that his reference to "50 ps of tree" refers to 50 pounds of marijuana.

14.     CHASE HITE then sent the UC another message stating "fast money is nice money . . .I have about 6-7 drop spots and like 4 POs and it's all family I got 3 little brothers & me n my girls parents houses grandparents houses . . . been doing this for 5-6 years now never had something get caught not once."  Based upon my training and experience, I believe his reference to drop spots is a reference to places that people deliver narcotics or proceeds to him in furtherance of his drug trade, and that his reference to POs refers to Post Office Boxes at which he receives narcotics and narcotics proceeds.

15.     Based upon this discussion, I believe that CHASE HITE, is engaged in cash-for-BTC transactions in order to launder proceeds of his trade in illegal narcotics.

16.     In response to this exchange, the UC and CHASE HITE agreed to a transaction in which HITE would send the UC another $54,000 in exchange for approximately $79,000 worth of cryptocurrency, amounting to a loan of approximately $25,000.  Upon receipt of the package, sent via Express Mail, forensic analysts at the United States Postal Inspection Service analyzed the package for fingerprints.  Fingerprints were identified on several pieces of tape found both inside and outside the package that matched HITE's fingerprints.  In addition, the package bore a return address that is known to be a location where HITE resides.

The Devices

17.     CHASE HITE was arrested by Officers of the Evansville, Indiana police department on or about July 21, 2021 date.  In connection with that arrest, the Officers seized three mobile phones from HITE's person incident to his arrest, namely, Phones 1-3.  On July 23, 2021, Judge Jill Marcrum of Vanderburgh Circuit Superior Court issued a search warrant authorizing the search of those devices.  Therefore, while the USPIS might already have all necessary authority to examine Phones 1-3, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.  Then, on or about July 18, 2021, USPIS Inspectors arrested HITE and seized Phone 4 incident to his arrest.

6.     The Devices are currently in storage at USPIS, 185 W. John Street, Hicksville, NY 11801.  In my training and experience, I know that the Devices has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the USPIS.

## TECHNICAL TERMS

7.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and

8

from the phone.  In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities.  These capabilities include: storing

names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet.  Wireless telephones may also

include global positioning system ("GPS") technology for determining the

location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader.  Removable

storage media include various types of flash memory cards or miniature hard

drives.  Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to

photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video,

or photographic files.  However, a portable media player can also store other

digital data.  Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or

miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media

include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

8.  Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device and PDA. In my training and experience, examining data stored

11

on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

9.      Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

10.      *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

    f.   I know that when an individual uses an electronic device to communicate with others in order to commit a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic devices are an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic devices are also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

11.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices

consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

12.     *Manner of execution.*  Because this warrant seeks only permission to examine s devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **<u>CONCLUSION</u>**

13.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*Joseph Marcus*

Joseph Marcus
Postal Inspector
United States Postal Inspection Service

Subscribed and sworn to before me
on August 25, 2021:

/s Roanne L. Mann
HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

14

## ATTACHMENT A

The property to be searched are the below electronic devices:

One red iPhone bearing the logo "Product (RED)" on back, as well as a sticker saying "ETHIKA" ("Phone 1");

One red iPhone bearing the logo "Product (RED)" on back ("Phone 2");

One blue Samsung phone, IMEI # 352863815289256, serial number R58R53X3ACY ("Phone 3");

One pink iPhone with pink glitter paint on the back, a sticker saying **"ETHIKA"** ("Phone 4").

Phones 1-3 were all obtained by the USPIS from a detective with the Evansville, Indiana Police Department, who recovered the devices in connection with a July 21, 2021 arrest of CHASE HITE.  Phone 4 was recovered by the USPIS from HITE in connection with his August 18, 2021 federal arrest.  The Devices are currently located at  185 W. John Street, Hicksville, NY 11801.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.     All records on the Devices described in Attachment A that relate to violations of Title 18, United States Code, Section 1956 and Title 21, United States Code, Sections 841 and 846 that involves CHASE HITE since June 2020 since including:

      a.   Communications and other evidence relating to HITE's transactions with the UC, including messages, search history relating to crypto currency, Localcryptos, other crypto currency exchanges and/or shipping packages to the UC;

      b.   Communications relating to crypto currency;

      c.   Information relating to types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      d.   Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      e.   All bank records, checks, credit card bills, account information, and other financial records; and

      f.   all records of shipping materials, tracking numbers and parcel information.

2.     Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.